UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

**TRALISA SHERIDAN,**
individually and on behalf
of all others similarly situated;

*Plaintiff,*

v.                                                                        Case No. 2:20-cv-244

**ASSICURAZIONI GENERALI
GROUP, S.p.A; GENERALI U.S.
BRANCH; AND GENERALI
GLOBAL ASSISTANCE, INC.
D/B/A CSA TRAVEL PROTECTION
AND INSURANCE SERVICES; and
CUSTOMIZED SERVICES
ADMINISTRATORS, INC.;**

*Defendants.*                                                    **JURY TRIAL DEMANDED**

**PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT**

COMES NOW Plaintiff Tralisa Sheridan ("Sheridan" or "Plaintiff"), individually and on behalf of all other similarly situated persons, against Defendants Assicurazioni Generali Group, S.p.A.; Generali U.S. Branch; Generali Global Assistance, Inc. d/b/a CSA Travel Protection and Insurance Services, a/k/a and f/k/a Customized Services Administrators, Inc. (collectively "Generali" or "Defendants"), and brings this putative class action. In support thereof, Plaintiff makes the following allegations upon personal knowledge of the facts pertaining to herself and on information and belief as to all other matters, and states as follows:

1

## I. NATURE OF ACTION

This is a class action arising out of Defendants' acts and omissions amounting to a breach of contractual duty, under the terms of travel insurance policies Defendants issued to Plaintiff. Defendants contracted to indemnify Plaintiff and all others similarly situated for pecuniary and other losses and damages incurred as a result of covered events that prevented insureds from taking their planned trip. Plaintiff's claims, as well as the claims of each proposed class member, are supported by the written provisions of the Master Policy for travel protection insurance underwritten and administered to them by Defendants, Master Policy No. TMP10010 (the "Policy"). *See* **Exhibit A**, The Policy, Master Pol. No. TMP100010.

1. Defendants have caused substantial harm to Plaintiff and the proposed class by improperly refusing to issue reimbursement for trip cancellations explicitly covered by the Policy. Plaintiff has been completely denied reimbursement for her Trip Cancellation Claim ("Claim"). Upon information and belief, Defendants have effectively adopted an approach to categorically issue denials to every Claim arising during the natural disaster that was brought on by COVID-19. Defendants refused to pay COVID-19 related trip cancellations by others insured under the Policy, whether said claimants submitted claims requesting indemnity for: (a) the Maximum Limit(s) Per Person or Plan for Trip Cancellation as listed on their respective Schedules of Benefits; (b) actual damages incurred due to trip cancellations; or (c) the price of the premiums initially paid by the insureds for Policies.

2. Plaintiff brings this action on behalf of herself and all other similarly situated individuals. Plaintiff seeks to recover compensatory, as well as declaratory and injunctive relief.

## II. PARTIES

3. Plaintiff Tralisa Sheridan is a citizen of the United States residing in the City of White Oak in Gregg County, Texas.

4. Defendant Assicurazioni Generali Group, S.p.A. (or "Generali Group") is an Italian corporation that regularly conducts business in Texas, with its principal place of business located in Trieste, Italy.

5. Defendant Generali U.S. Branch (or "Generali U.S.") is a Maryland corporation with its principal place of business located in New York, New York. Generali Group is licensed to do business in all 50 states as well as in the District of Columbia; specifically, Generali U.S. is engaged in the business of issuing insurance policies that are underwritten by Generali Group.

6. Defendant Generali Global Assistance, Inc. (or "GGA") is a New York corporation with its principal place of business in Bethesda, Maryland and branches in Alabama, Arizona, Florida, Georgia, Indiana, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nevada, New Mexico, North Dakota, Ohio, Pennsylvania, South Dakota, and West Virginia.

7. GGA also does business under the name Europ Assitance USA, Inc. in Idaho and Michigan.

8. GGA is formerly and alternatively known as Customized Services Administrators, Inc. ("CSA"). CSA registered the trademark "CSA Travel Protection" in 2003.

9. CSA is an active California corporation with its principal place of business in California and branches in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Hawaii, Indiana, Kentucky, Maine, Massachusetts, Minnesota, Missouri, Montana, New Mexico, Nevada, North Carolina, North Dakota, Ohio Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming.

10. Five of the above-mentioned CSA branches are alternatively known as Generali Global Assistance and Insurance Services.[1]

11. Because of the unitary nature of Generali's businesses, all above-listed Defendant entities; Generali Group, Generali U.S., GGA, and CSA, shall hereinafter be referred to and treated collectively as "Generali" or "Defendants" unless addressed separately.

12. Currently and at all times relevant herein, Generali, through its practices and relationships with its subsidiaries and alternate business names under which it carries out a vast majority of its U.S. business, has consistently shown an existing unity of ownership, of operation, and of use sufficient to definitively establish the unitary nature of Generali's business. Specifically, in addition to the clear unity of ownership as set forth above, Generali's operational unity is evidenced by central advertising, accounting, and management in the United States; further, Generali has demonstrated unity of use in its general system of operation.

13. For the foregoing reasons, all Defendant Generali entities can be said to maintain the same registered agent in Texas, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, who can be served at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant; there are more than 100 members of the Class; and upon information and belief the aggregate amount in controversy exceeds $5,000,000.00 exclusive of interest and costs.

---

[1] Arkansas, Hawaii, Indiana, Maine, and Utah.

15. This Court has general jurisdiction over Defendants because they have purposefully availed themselves of the benefits and protections of the state by conducting continuous and systematic business operations that are so substantial in this judicial district so as to render it essentially at home in this state. Generali Group underwrites insurance policies in the United States through Generali U.S. Branch. Generali U.S. is licensed to do business in the state of Texas and underwrites insurance policies to residents of this district. GGA conducts business under its fictitious business name, CSA, which administers plans to residents of this district. CSA has an active branch located within the state of Texas and holds an active license with the Texas Department of Insurance.[2]

16. This Court has specific jurisdiction over Defendant's United States entities; Generali U.S., GGA, and CSA, pursuant to Texas's long-arm statute.[3] Generali, by and through its U.S. entities, does business in Texas by contracting with Policy purchasers to insure against risk and loss related in whole or in part to the state.

17. Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. § 1391 in that all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the Eastern District of Texas.

## IV. FACTUAL BACKGROUND

18. On March 26, 2019, Plaintiff used the online vacation booking website VRBO.com to book accommodations for her daughter's destination wedding in Florida the following Spring.

---

[2] License/Registration Number(s): 19884, 19885
[3] Texas courts have jurisdiction over disputes concerning contracts concluded between a Texas resident and a nonresident where 'either party is to perform the contract in whole or in part in this state.' A nonresident does business in Texas if the nonresident contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042(1).

Plaintiff paid approximately $3,500 through VRBO to reserve oceanfront vacation rental accommodations.

19. Upon checkout on VRBO's booking site, Plaintiff elected to pay an optional, additional fee of $180.84 for a travel insurance coverage plan ("CSA Travel Protection" or "Plan"). ***See* Exhibit B,** Policy Confirmation Letter Email (3.26.19).

20. Plaintiff had travel plans in place for herself, her husband, her son, her parents, her son-in law's family, and their local pastor from their Texas hometown who was to travel with the group in order to marry the bride and groom in Florida (collectively, the "wedding party" or "group").

21. Plaintiff and the wedding party intended to drive to Florida on March 21, 2020 and return on March 28, 2020. The ceremony was set to be held oceanside, on the sands of Navarre Beach in Santa Rosa County, Florida. Plaintiff booked the beachside rental in order to accommodate the entire wedding party except for the bridal party.

### The COVID-19 Pandemic

22. On January 21, 2020, the first case of Coronavirus ("COVID-19") was diagnosed in the United States.

23. Within ten days of the first U.S. diagnosis, approximately 8,000 Americans were confirmed infected by the life-threatening virus.

24. On January 30, 2020, the World Health Organization quickly declared COVID-19 a "Global Health Emergency;" a "Public Health Emergency of International Concern," on the next day, the President declared COVID-19 a public health emergency.

25. On February 11, 2020, five days after the first coronavirus death in the U.S., the coronavirus was given its official name, COVID-19, by the World Health Organization.

26. CDC officials said it was the first quarantine order issued by the federal government in over 50 years.

27. On February 21, 2020, Dr. Nancy Messonnier, director of the CDC's National Center for Immunization and Respiratory Diseases, told reporters that U.S. health officials were preparing for the coronavirus to become a pandemic.[4]

28. On February 29, 2020, the U.S. government issued a "do not travel" warning and prohibited travel between the United States and several countries with COVID-19 outbreaks.

29. On March 1, 2020, Florida Governor Ron DeSantis declared a State of Emergency. DeSantis delegated Florida's State Health Officer to "take any action necessary to protect the public health," for as long as the emergency lasted."[5] The Florida Department of Health was given the power to make decisions on quarantining people and cancelling events. Dr. Jose Szapocznik, a professor of Public Health Sciences at the University of Miami, said: "It's sort of like your building is on fire. You as a firefighter don't call your boss and say, 'can I turn on the hose?'"[6]

30. After the Florida governor's March 1 declaration, Plaintiff's wedding coordinator, Gold Coast Event Services, cancelled on Plaintiff and her family.

31. On March 4, The World Health Organization raised the mortality rate of coronavirus up to 3.4%. In comparison, the seasonal flu kills fewer than 1% of those infected.

32. On March 5, 2020, the President was precluded from travelling to Florida for a Health Technology convention he had been planning to attend, as the event was cancelled for the first

---

[4] https://www.usatoday.com/story/news/world/2020/02/21/coronavirus-who-contain-outbreak-iran-deaths-south-korea-cases/4829278002/
[5] https://www.flgov.com/wp-content/uploads/orders/2020/EO_20-51.pdf
[6] https://www.nbcmiami.com/news/local/florida-is-under-a-public-health-emergency-what-does-that-mean/2200677/ (stating also "A public health emergency can last as long as it needs to.")

7

time in 58 years due to the convention's announced cancellation. Cancellation was deemed "unavoidable" by the convention, in order to meet its "obligation to protect the health and safety of [its] global community, employees and local residents," a news release said.[7]

33. On March 11, 2020, the same day the World Health Organization reclassified COVID-19 as a worldwide pandemic, the CDC awarded Florida $27 million to stop the virus's spread.

34. On March 13, 2020, the President declared a "National Emergency," which he said freed up nearly $50 billion in additional disaster funding. The same day, Texas Governor Greg Abbott declared a "State of Disaster" in Texas.

His order read:

> NOW, THEREFORE, I, GREG ABBOTT, Governor of the State of Texas, do hereby certify that *COVID- 19 poses an imminent threat of **disaster***. In accordance with the authority vested in me by Section 418.014 of the Texas Government Code, *I hereby declare a **state of disaster** for all counties in Texas.*[8]

35. March 13, 2020 was also an eventful day in Florida when Florida Governor Ron DeSantis announced a spike in Florida cases upon discovery of thirteen new positive cases. Governor DeSantis also announced that the state had only received less than half the amount of COVID-19 testing kits that had been ordered.

36. On March 16, 2020, the President issued the *President's Coronavirus Guidelines for America*, known also as the "30 Days to Slow the Spread" campaign, which called for Americans **to avoid social gatherings of more than 10 people for the next 15 days** and to **limit discretionary travel**, among other guidelines. The CDC had published a page on its official website dedicated to COVID-19, including links to additional CDC guidelines published in furtherance of the "stop the spread" initiative. Under the site's "Travel" drop-down tab, travel-

---

[7] https://www.clickorlando.com/news/local/2020/03/05/health-it-conference-trump-planned-to-attend-in-orlando-canceled-amid-coronavirus-fears/
[8] https://gov.texas.gov/news/post/governor-abbott-declares-state-of-disaster-in-texas-due-to-covid-19

8

specific informational pages were made available, such as one titled "Travel in the US." The page listed seven key inquiries to ask oneself "if you are thinking about traveling away from your local community:"

> **Is COVID-19 spreading where you're going?**
> You can get infected while traveling.
> **Is COVID-19 spreading in your community?**
> Even if you don't have symptoms, you can spread COVID-19 to others while traveling.
> **Will you or those you are traveling with be within 6 feet of others during or after your trip?**
> Being within 6 feet of others increases your chances of getting infected and infecting others.
> **Are you or those you are traveling with more likely to get very ill from COVID-19?**
> Individuals who have an increased risk of severe illness from COVID-19 should limit their travel.
> **Do you live with someone who is more likely to get very ill from COVID-19?**
> If you get infected while traveling you can spread COVID-19 to loved ones when you return, even if you don't have symptoms.
> **Does the state or local government where you live or at your destination require you to stay home for 14 days after traveling?**
> Some state and local governments may require people who have recently traveled to stay home for 14 days.
> **If you get sick with COVID-19, will you have to miss work or school?**
> People with COVID-19 disease need to stay home until they are no longer considered infectious.[9]

37. Governor DeSantis ordered that all bars and nightclubs be shut down state-wide and that students would not return to class until at least mid-April. A study was released that day, finding that viable virus could be detected up to three hours later in the air, up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel.[10] The next day a new CDC report was released, showing that people of all ages were at risk for contracting the virus.

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-in-the-us.html
[10] https://www.usatoday.com/story/news/health/2020/03/18/heres-how-long-coronavirus-can-live-surfaces-and-air-study/2863287001/

38. On March 19, 2020, three days before Plaintiff's scheduled departure date, the U.S. surpassed 10,000 cases.

39. On March 20, 2020, as of 6 p.m., the number of Florida-related cases was 563. 510 cases in Florida residents and 53 non-Florida residents who were diagnosed while visiting the Sunshine State.[11] Orange County, Florida instituted a curfew.[12]

40. On March 22, 2020, Florida's Governor sent a letter to the President formally requesting that the President declare a Major Disaster for the State of Florida and include in the declaration the activation of multiple FEMA programs."

41. Plaintiff and her group planned to head to Florida from their home in White Oak, Texas. Unfortunately, the group's plans to travel by automobile raised even more issues by March 19th, when concerns were raised over the availability of fuel, or lack thereof, at gas stations across the nation.

## **Plaintiff's Trip Cancellation**

42. On March 19th, Plaintiff relying upon the guidelines and warnings from all levels of government and from the President, realizing that her accommodations at her destination were inaccessible decided to cancel their reservation. *See* **Exhibit C,** Accommodation Cancellation Confirmation (3.19.20).

43. The road trip out of Texas would have involved travelling through Alabama, Louisiana, and Mississippi to reach their Florida destination. Mississippi's governor had declared a state of emergency on March 14, and by March 29, the day Plaintiff and the wedding party would have been driving back home, Texas Governor Greg Abbott had officially announced that travel by

---

[11] https://www.clickorlando.com/news/local/2020/03/20/florida-now-at-520-coronavirus-cases-10-deaths/
[12] https://www.clickorlando.com/news/local/2020/03/20/orange-county-implements-county-wide-curfew-during-coronavirus-pandemic/

10

road from any location in the state of Louisiana into Texas would require a 14-day self-quarantine. Multiple highway electronic signs were placed in directions between Louisiana and Texas, warning drivers that personal travel from Louisiana must quarantine.

44. On March 21, Florida's numbers showed 706 cases confirmed in Florida residents and 57 confirmed in non-Florida residents. Navarre Beach was shut down by Santa Rosa County that day.

45. Plaintiff purchased the Policy at the same time she booked the accommodations in late March 2019, she could not have possibly foreseen (nor could anyone) the outbreak of a worldwide viral pandemic that would unfold almost a year later.

### **Defendants' Complete Denial of Plaintiff's Claims as an Insured Policyholder**

46. Plaintiff called Defendants on March 21, 2020, the day of her scheduled Trip Departure Date, following the Policy clause stating "Should you have a dispute concerning your premium or about a claim you should contact Generali US Branch first."[13] Plaintiff called the Program Administrators (CSA's) toll-free telephone number listed on that page of the Policy. Once on the line with a CSA agent, she was told that she needed to submit her claim using the online "eClaims portal" at https://homeaway-travel-us.eclaims.csaclaims.com/.

47. The next day, March 22, Plaintiff submitted her claim through the online eClaims portal as soon as she was able to, because the process took approximately 45 minutes and she had to find time to set aside for the process. She received an email confirmation that her Claim had been submitted. *See* **Exhibit D,** Email Confirmation, Trip Cancellation Claim Filed (3.22.20).

48. It was not until 38 days later, April 29, that Plaintiff received a notification on the eClaims portal stating: "We're sorry to inform you that your claim has been denied. You will receive

---

[13] Policy p. 31.

an email with detailed explanations shortly." *See* **Exhibit E,** eClaims portal Summary of Claim No. 20024681-01. Plaintiff received the same message, and nothing more, repeated each time she visited the eClaims portal for updates on April 29, April 30, May 4, and May 6. As of the date of this Complaint, Plaintiff has yet to receive any form of "email with detailed explanations" as promised in the eClaims portal message.

49. The Policy provides coverage for Trip Cancellation, among other events.

50. The Trip Cancellation Benefit Rider states:

Benefits will be paid, up to the amount in the Schedule, for the forfeited, prepaid, non-refundable, non-refunded and unused published Payments that you paid for your Trip, <u>if you are prevented from taking your Trip due to one of the following unforeseeable Covered Events that occur before departure on your Trip</u> to you or your Traveling Companion, while your coverage is in effect under this Policy.

### "Covered Events" Under the Policy

*Inaccessible Accommodation Coverage*

51. The Policy's lists the following item (hereinafter "Inaccessible Accommodations Coverage") under "Covered Events:"

<u>Your Accommodations at your destination made inaccessible</u> due to fire, flood, volcano, earthquake, hurricane <u>or other natural disaster</u>. We will only pay benefits for losses occurring within 15 calendar days after the event renders the destination inaccessible.
<u>For the purpose of this coverage, inaccessible means your Accommodations can not be reached by your original mode of transportation.</u> Benefits are not payable if the event occur or if a hurricane is named prior to or on your Trip Cancellation Coverage Effective Date.[14]

52. Due to the COVID-19 pandemic, the President of the United States officially approved declarations of disaster for Texas and Florida, Plaintiff's domicile and trip destination. The President also, in declaring the pandemic a "national emergency," invoked the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. § 5121 *et seq.*, which is

---

[14] Policy, p. 17.

the statutory authority for most federal disaster response activities. The President's Disaster Relief Fund, managed by FEMA, is used to fund various "disaster assistance programs."

53. The declarations of disaster throughout the country and, specifically as to Plaintiff's case, in Texas and Florida, had already been officiated as of the date of Plaintiff's Trip Cancellation.

### *Quarantine Coverage*

54. Further, the Policy's "Covered Events" specifically provide for coverage in the event of "Being hijacked or Quarantined," and "Quarantine" *is* a Defined Term set forth in the Policy and stated specifically as follows: "QUARANTINE means the enforced isolation of your or your Traveling Companion, for the purpose of preventing the spread of illness, disease or pests."

### **Generali's Blanket Denial of All Claims Filed as a Result of COVID-19 Effects**

55. Generali, in "A Message to [their] Customers About Coronavirus," stated:

> As of January 29, 2020, the Coronavirus (COVID-19) outbreak was considered a foreseeable event. Consequently, any event(s) related to COVID-19 for all new travel policies purchased on or after January 29, 2020[15] may thereby be excluded in accordance with the terms and conditions of the Policy. In addition, there will be no coverage for COVID-19 related losses occurring on or after March 11, 2020, the date COVID-19 was formally declared a pandemic by the World Health Organization. Please note, our plans will not cover fear of travel. Customers are strongly encouraged to read their Description of Coverage or Insurance Policy (https://www.qeneralitravelinsurance.com/retrieve-policy.html) for details regarding their available coverage.

*See* **Exhibit F,** Generali COVID-19 Notice.

56. Despite unambiguous language in the policy, which is a fully integrated insurance agreement, Defendants breached the policy by failing to indemnify Plaintiff for the losses she incurred as a result of the forced cancellation of her travel plans due to a covered event.

---

[15] While this condition is inapplicable to Plaintiff because she purchased her Policy in 2019, it does apply to potentially thousands of Class Members who will be subject to the condition due to their date of Policy purchase.

13

## V. CLASS ALLEGATIONS

57. Plaintiff brings this action, individually, and on behalf of a nationwide class, pursuant to Federal Rule of Civil Procedure Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), 23(b)(3) and/or 23(c)(4), defined as follows :

   **Nationwide Class**
   All persons located within the United States that purchased Generali insurance plans accompanied by the Policy and were prevented from taking a trip as a result of a covered event during the COVID-19 pandemic who have incurred out of pocket Trip Cancellation expenses.

58. In the alternative to the Nationwide Class, and pursuant to Federal Rule of Civil Procedure, Rule 23(c)(5), Plaintiff seeks to represent the following state class only in the event

59. that the Court declines to certify the Nationwide Class above. Specifically, a "State Class" consisting of the following:

   **Texas Class**
   All persons in Texas that purchased Generali insurance plans accompanied by the Policy and were prevented from taking a trip as a result of a covered event during the COVID-19 pandemic who have incurred out of pocket Trip Cancellation expenses.

60. Excluded from the class(es) are Defendants, any entities in which Defendants have a controlling interest, any of the officers, directors, or employees of the Defendants, the legal representatives, heirs, successors, and assigns of the Defendants, anyone employed with Plaintiff's counsels' firms, any Judge to whom this case is assigned, and his or her immediate family.

61. **Numerosity.** The Class is so numerous that joinder of all members is impracticable. Due to the nature of the insurance involved, the members of the Class are geographically dispersed throughout the United States. While the exact number of Class members is information not readily available at this time, as only Generali possesses the data to determine a numerical figure to indicate the Policies sold throughout the US that have resulted in myriad claims

Generali has received from consumers who would qualify as Class Members for purposes of this action, Plaintiff has reasonable belief that there are thousands of potential members in the Class. Generali states on its website that it has a presence in 50 countries in the world and earned a total premium income in excess of €69.7 billion (approximately $80 billion) in 2019, serving 61 million customers worldwide.[16]

62. **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class she seeks to represent because Plaintiff and all Class members purchased identical coverage from Generali containing identical language regarding Trip Cancellation and Covered Events, and all Class members have been improperly denied coverage.

63. **Adequacy.** Plaintiff has retained counsel experienced in complex class action and insurance litigation. Plaintiff has no interests which are adverse to or in conflict with other members of the Class. Plaintiff will fully and adequately protect the interests of all members of the Class.

64. **Commonality.** The questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, namely: whether the events caused by the emergence of the COVID-19 pandemic constitute Covered Events under the Policy; whether the effects of any stay-at-home directives, "stop the spread" initiatives, or any other national health or safety warnings issued as a result of the COVID-19 pandemic that precluded Class Members from embarking upon or completing trips for which they purchased Policy coverage, trigger Covered Events under the Policy's terms; and whether the Policy requires Generali to reimburse Policy holders for expenses incurred as a result of trip cancellation due to events caused by the COVID-19 pandemic national disaster.

---

[16] https://www.generali.com

65. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

66. The interest of the members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class is cohesive, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the Class are uniform and generally formulaic, and the expense and burden of individual litigation could preclude them form fair redressal of the wrongs done to them. Plaintiff anticipates no difficulty in the management of this action as a class action.

## COUNT I: BREACH OF CONTRACT

### (On Behalf of the Nationwide Class or, in the alternative, the State Class)

67. The preceding paragraphs are incorporated by reference as if fully alleged herein.

68. Plaintiff and the class purchased insurance from Defendant and were thereupon issued the Policy.

69. The Policy is a valid and enforceable contract between Generali and all policyholders, including Plaintiff and class members.

70. Plaintiff and the class members substantially performed their obligations under the terms of the Policy and Class Policies.

71. Plaintiff and the class members suffered losses from events that should be reimbursed as results of Covered Events under the Policy.

72. Defendants have failed to compensated Plaintiff and class members for their respective losses as required by the Policy.

73. As a direct and proximate result of Defendant's breaches, Plaintiff and the class have sustained damages that are continuing in nature in an amount to be determined at trial.

### COUNT II: DECLARATORY AND INJUNCTIVE RELIEF

**(On Behalf of the Nationwide Class or, in the alternative, the State Class)**

74. The preceding paragraphs are incorporated by reference as if fully alleged herein.

75. An actual controversy has arisen and now exists between Plaintiff and the class, on the one hand, and Defendant, on the other, concerning the respective rights and duties of the parties under the Policy.

76. Plaintiff contends that Generali has breached the Policy by failing to timely pay Class Members for their respective losses for covered damages.

77. Plaintiff, therefore, seeks a declaration of the parties' respective rights and duties under the Policy and requests the Court to declare Generali's conduct unlawful and in material breach of the Policy so as to avoid future controversies that would allow for continual injustices such as the one at issue here, where huge insurance companies take advantage of masses of consumers.

78. Pursuant to a declaration of the parties' respective rights and duties under the Policy and Class Policies, Plaintiff further seeks an injunction enjoining Defendant (1) from continuing to engage in conduct in breach of the Policy; and (2) ordering Defendant to comply with the terms

of the Policy, including payment of all amounts due to each respective class member under the stated Policy coverages that were extended to them upon purchase.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests relief and judgment against Defendant as follows:

(a) That the Court enter an order certifying the class, appointing Plaintiff as a representative of the class, appointing Plaintiff's counsel as class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class;

(b) For a judgment against Defendant for the causes of action alleged against it;

(c) For compensatory damages in an amount to be proven at trial;

(d) For a declaration that Defendant's conduct as alleged herein is unlawful and in material breach of the Policy and Class Policies;

(e) For appropriate injunctive relief, enjoining Defendant from continuing to engage in conduct related to the breach of the Policies;

(f) For pre-judgment and post-judgment interest at the maximum rate permitted by law;

(g) For Plaintiff's attorneys' fees;

(h) For Plaintiff's costs incurred; and

(i) For such other relief in law or equity as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

July 20, 2020

Respectfully submitted,

*/s/ J. Ryan Fowler*
J. Ryan Fowler
Texas State Bar No. 24058357
**THE POTTS LAW FIRM, LLP**
3737 Buffalo Speedway, Suite 1900
Houston, TX 77098
Phone: (713) 936.8881
Fax: (713) 583.5388
rfowler@potts-law.com


*/s/ R. Brent Cooper*
R. Brent Cooper
Texas State Bar No. 04783250
**COOPER & SCULLY, P.C**
900 Jackson Street, Suite 100
Dallas, TX 75202
Phone: (214) 712.9500
Fax: (214) 712.9540
brent.cooper@cooperscully.com

*Counsel for Plaintiff*

## **EXHIBITS**

**EXHIBIT A,** The Policy, Master Pol. No. TMP100010

**EXHIBIT B.** Policy Confirmation Letter Email (3.26.19)

**EXHIBIT C,** Accommodation Cancellation Confirmation (3.19.20)

**EXHIBIT D,** Email Confirmation, Trip Cancellation Claim Filed (3.22.20)*

**EXHIBIT E,** eClaims portal Summary of Claim No. 20024681-01

**EXHIBIT F,** Generali COVID-19 Notice